**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| ROBLE AHMED SALAD,<br><br>Petitioner,<br><br>v.<br><br>STATE OF ALASKA, Department of Corrections; ARLANDO HERNANDEZ, Superintendent of the Anchorage Correctional Complex, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; THOMAS HOMAN, White House Border Czar, in his official capacity; and CALEB VITELLO, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity;<br><br>Respondents. | Case No. 3:25-cv-00029-TMB-KFR |

**REPORT AND RECOMMENDATION RE HABEAS PETITION**

Before the Court is a Petition for Habeas Corpus Relief ("Petition") filed by Petitioner Roble Ahmed Salad, a citizen of Somalia and resident of Anchorage, Alaska.[1] Federal Respondents U.S. Immigration and Customs Enforcement ("ICE"); Thomas Homan, White House Border Czar, in his official capacity; and Caleb Vitello, Acting Director of ICE, in his official capacity (collectively, "Federal Respondents"); oppose and move to dismiss the Petition.[2] The Court held an evidentiary hearing on the matter on February 19, 2025.

Upon review and consideration of the full record and briefing in this case, the Court finds that Petitioner's continued detention pursuant to 8 U.S.C. § 1231(a)(6) violates federal law. As a result, Petitioner is entitled to immediate release from custody subject to appropriate conditions of supervision. The Court therefore recommends that the Petition be **GRANTED**.

[1] Docket 1.
[2] Docket 12.

## I. BACKGROUND

On December 8, 2022, Petitioner sought asylum at the southern border of the United States, where he was detained by U.S. Department of Homeland Security ("DHS") agents.[3] Petitioner was later placed into removal proceedings based on his lack of valid documents and entry without inspection or parole.[4] On April 28, 2023, Petitioner had a hearing in his removal proceedings before an immigration judge.[5] The immigration judge found Petitioner's fear of persecution not credible, denied his application for asylum, and ordered him removed to Somalia.[6] Petitioner appealed to the Board of Immigration Appeals, which dismissed the appeal.[7] On May 30, 2023, the removal order against Petitioner became final.[8]

After the removal order became final, ICE sought to obtain a travel document from Somalia that would authorize Petitioner's return to that country.[9] However, ICE was initially unable to obtain this travel document, which prevented the agency from executing the removal order.[10] Due to the lack of a travel document, ICE determined that there was no "significant likelihood of [Petitioner's] removal in the reasonably foreseeable future."[11] Consequently, on November 29, 2023, ICE released Petitioner from custody on an order of supervision ("OSUP").[12] Petitioner had been in custody since his entry without inspection into the United States in December 2022.[13]

On January 15, 2025, Petitioner, through counsel, filed an application for Temporary Protected Status ("TPS") with U.S. Citizenship and Immigration Services ("USCIS").[14] The TPS program "provides humanitarian relief to foreign nationals in the United States who come from specified countries," including Somalia.[15] If the government designates a country for

---

[3] Docket 13 at 1–2, ¶¶ 3–4.
[4] Docket 13 at 2, ¶ 5 (citing 8 U.S.C. § 1182(a)(7)(A)(i)(I), (a)(6)(A)(i)).
[5] Docket 13 at 2, ¶ 5.
[6] Docket 13 at 2, ¶ 6; Docket 12-1 at 3.
[7] Docket 13 at 2, ¶ 7.
[8] Docket 13 at 2, ¶ 7.
[9] Docket 13 at 2, ¶ 8.
[10] Docket 13 at 2, ¶ 9.
[11] Docket 13 at 2, ¶ 9.
[12] Docket 13 at 2, ¶ 9.
[13] Docket 13 at 1–2, ¶¶ 3–5, 9.
[14] Docket 13 at 3, ¶ 13.
[15] *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021) (citing 8 U.S.C. § 1254a).

TPS, which it may do when a country is "beset by especially bad or dangerous conditions," those citizens of that country who are "already present in the United States" may seek TPS.[16] TPS "protects [noncitizens] from removal and authorizes them to work here for as long as the TPS designation lasts."[17]

The government first designated Somalia for TPS on September 16, 1991.[18] Since then, Somalia's TPS designation has been "consecutively extended."[19] The last extension took effect on September 18, 2024, and is set to expire on March 17, 2026, unless Somalia is redesignated or its existing designation is extended.[20] The government is required to periodically review a country's designation and, at least 60 days before the designation is set to expire, to determine whether to extend or terminate the designation.[21]

Noncitizens who have been ordered removed—such as Petitioner—are eligible for TPS.[22] In addition, individuals who file an application that "establish[es] a prima facie case of eligibility" for TPS are entitled to the benefits of removal protection and work authorization until USCIS issues a final decision granting or denying the application.[23] There is no dispute that Petitioner filed a prima facie TPS application and that he therefore cannot legally be removed due to his provisional entitlement to TPS benefits.[24]

When Petitioner filed his TPS application, he had been living in Alaska for several

---

[16] *Id.*
[17] *Id.*
[18] Designation of Nationals of Somalia for Temporary Protected Status, 6 Fed. Reg. 46804 (Sept. 16, 1991).
[19] *See* Extension and Redesignation of Somalia for Temporary Protected Status, 89 Fed. Reg. 59135, 59136 (July 22, 2024).
[20] *Id.* at 59135.
[21] 8 U.S.C. § 1254a(b)(3).
[22] *Sanchez*, 593 U.S. at 412 (citing 8 U.S.C. § 1254a(c)(2)(A)(ii); 8 C.F.R. § 244.3); *see also* 8 U.S.C. § 1254a(g) ("Except as otherwise specifically provided, this section shall constitute the exclusive authority of the Attorney General under law to permit aliens who are . . . otherwise deportable . . . to remain in the United States temporarily because of their particular nationality or region of foreign state of nationality.").
[23] 8 U.S.C. § 1254a(a)(4)(B).
[24] *See* Docket 12 at 9; Docket 13 at 4, ¶ 20; Docket 19 at 6; *see also* Docket 19-3; Docket 19-4. Petitioner's counsel informed the Court at the evidentiary hearing that Petitioner provided biometrics to USCIS and that his application has now been perfected. Docket 30 at 34:3–6.

months.[25] Petitioner was living with a friend at an apartment in Anchorage, and he provided the address for that apartment in his TPS application.[26] On February 5, 2025, shortly after leaving his apartment, ICE detained Petitioner pursuant to an administrative warrant for his arrest.[27] Petitioner was processed at the local ICE Enforcement and Removal Operations ("ERO") office and then transferred to the Anchorage jail.[28]

On February 7, 2025, Petitioner filed the present Petition and an application for an order to show cause in federal district court.[29] The following day, a local ERO officer served on Petitioner a notice of revocation of release at the jail.[30] In this notice, ICE informed Petitioner that it had revoked his OSUP "based on a review of [his] official alien file and a determination that there are changed circumstances in [his] case."[31] Specifically, ICE stated, it had "determined that [Petitioner] can be expeditiously removed from the United States pursuant to the outstanding order of removal against [him]."[32] The reason given for this determination was that "[Petitioner's] case is under current review by Somalia for the issuance of a travel document."[33]

On the night of February 9, 2025—the day after Petitioner received the notice of revocation of release—Petitioner was transported from the Anchorage jail to a detention facility in Texas.[34] Petitioner's counsel, who had not been served the notice of revocation of release and who learned of the transport only after calling the jail the next morning,[35] objected to Petitioner's transfer to the facility in Texas and started working to secure his return to

---

[25] Docket 30 at 5:22–23, 7:13–23, 8:5–8; Docket 29-1. Petitioner had and continues to have work authorization, and he currently works as a caregiver for elderly people. Docket 30 at 5:24–6:2, 6:12.
[26] Docket 30 at 7:13–23; Docket 13 at 3, ¶ 12.
[27] Docket 30 at 18:23–19:12; Docket 13 at 3, ¶¶ 13–14; Docket 20-2.
[28] Docket 13 at 3–4, ¶¶ 14–15.
[29] Docket 1; Docket 2.
[30] Docket 13 at 4, ¶ 16; Docket 20-1. This notice was not served on Petitioner's counsel, even though such service was required pursuant to 8 C.F.R. § 292.5. Docket 14-1 at 5, ¶¶ 12–13.
[31] Docket 20-1 at 1.
[32] Docket 20-1 at 1.
[33] Docket 20-1 at 1.
[34] Docket 14-1 at 4, 6, ¶¶ 10, 16.
[35] According to Petitioner's counsel, jail staff advised her that she would be unable to communicate with her client from February 7 to February 9, 2025, because Petitioner was in medical segregation and jail policies and available services did not permit any form of communication during that period. Docket 14-1 at 3–4, ¶ 8.

Alaska.[36] That same morning, the Court granted Petitioner's application for an order to show cause, ordering Respondents to file "a return certifying the true cause of the detention" and permitting Petitioner to file a reply.[37] The Court further set the matter for an evidentiary hearing on February 14, 2025.[38] In the meantime, ICE agreed to transport Petitioner back to Alaska.[39] In addition, Federal Respondents filed a combined return and motion to dismiss,[40] and Petitioner filed a reply.[41]

For several reasons, including the fact that Petitioner did not make it back to Alaska in time for the scheduled evidentiary hearing, the Court converted the hearing to a status conference and deferred ruling on the Petition.[42] At the status conference, the Court heard the parties' arguments on the Petition's merits; asked Federal Respondents to provide copies of Petitioner's notice of revocation of release, the administrative warrant that led to Petitioner's arrest, and Petitioner's OSUP; and reset the evidentiary hearing for February 19, 2025.[43] Before the evidentiary hearing, Petitioner filed a trial brief with several attached exhibits,[44] and Federal Respondents filed a notice containing copies of the documents that the Court previously had asked them to provide.[45]

On February 19, 2025, the Court held the scheduled evidentiary hearing.[46] The Court heard testimony from Petitioner and the friend with whom Petitioner lives. The Court also admitted several exhibits that Petitioner offered.[47] Federal Respondents offered no new evidence and indicated that they intended to rely on the evidence they had previously filed with

---

[36] Docket 14-1 at 4–5, ¶¶ 10–11.
[37] Docket 4 at 1 (quoting 28 U.S.C. § 2243).
[38] Docket 4 at 1–2.
[39] Docket 14-1 at 15, ¶ 15.
[40] Docket 12. To support their return and motion to dismiss, Federal Defendants separately filed declarations from two ERO officers who have interacted with Petitioner. *See* Docket 13; Docket 16.
[41] Docket 14. Respondents State of Alaska, Department of Corrections; and Arnaldo Hernandez, Superintendent of the Anchorage Correctional Complex, in his official capacity; filed a response taking no position on whether the Petition should be granted. Docket 9 at 2.
[42] Docket 17.
[43] Docket 17.
[44] Docket 19.
[45] Docket 20.
[46] Docket 26; Docket 30.
[47] Docket 29.

the Court.[48] After taking evidence and hearing the parties' arguments, the Court took the matter under advisement.

## II. LEGAL STANDARDS

The Immigration and Nationality Act ("INA") authorizes the detention of noncitizens during immigration proceedings.[49] There are various detention statutes in the INA, which "apply at different stages of a[] [noncitizen's] detention."[50] The statute at issue in this case is 8 U.S.C. § 1231, which governs the detention and release of noncitizens who have been ordered removed. Under § 1231(a), DHS must remove such noncitizens within a 90-day "removal period."[51] Detention is mandatory during the removal period.[52] If the removal period expires before the noncitizen has been removed, § 1231(a)(6) authorizes DHS to continue the detention only if the noncitizen is (1) "inadmissible" on certain specified grounds, (2) "removable" on certain specified grounds, (3) determined by DHS to be a "risk to the community," or (4) determined by DHS to be "unlikely to comply with the order of removal."[53] Otherwise, the noncitizen must be released subject to an order of supervision.[54]

A noncitizen who is detained pursuant to § 1231(a)(6) may bring a habeas petition claiming that their continued post-removal-period detention violates federal law.[55] In *Zadvydas v. Davis*, the Supreme Court held that § 1231(a)(6) limits a noncitizen's post-removal-period

---

[48] Docket 30 at 4:13–14.

[49] *See* 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), 1231(a).

[50] *Diouf v. Mukasey*, 542 F.3d 1222, 1228 (9th Cir. 2008).

[51] *See* 8 U.S.C. § 1231(a)(1), (a)(2)(A); *see also Hernandez v. Ashcroft*, 345 F.3d 824, 828 n.2 (9th Cir. 2003) (explaining that although the statute refers to the Attorney General, the Homeland Security Act of 2002 transferred most immigration law enforcement functions from the Department of Justice to the Department of Homeland Security).

[52] 8 U.S.C. § 1231(a)(2).

[53] *Id.* § 1231(a)(6).

[54] *Id.* § 1231(a)(6), (a)(3).

[55] *See* 28 U.S.C. § 2241 (authorizing district courts to grant writ of habeas corpus whenever a petitioner is "in custody in violation of the Constitution or laws and treaties of the United States"); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (noting that habeas remains "the basic method for obtaining review of continued custody" after a removal order is final); *Singh v. Holder*, 638 F.3d 1196, 1211 (9th Cir. 2011), *abrogated on other grounds by Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) ("[Noncitizens] may continue to bring collateral legal challenges to the Attorney General's detention authority . . . through a petition for habeas corpus." (internal quotation marks and citation omitted) (alteration in original)); *Aguilar v. U.S. Immig. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 11 (1st Cir. 2007) ("[D]istrict courts retain jurisdiction over challenges to the legality of detention in the immigration context.").

detention to "a period reasonably necessary to bring about that [noncitizen's] removal from the United States."[56] A six-month detention period following entry of a final removal order while DHS attempts to remove the noncitizen is "presumptively reasonable."[57] When a detention exceeds this presumptively reasonable period, the noncitizen has the initial burden to demonstrate that there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."[58] If the noncitizen satisfies their initial burden, the government must then "respond with evidence sufficient to rebut that showing."[59] If the government fails to meet their burden, then the continued detention is unreasonable and the noncitizen must be released.[60]

## III. DISCUSSION

Petitioner is currently detained pursuant to § 1231(a)(6), based on ICE's determination that Petitioner can now be "expeditiously removed" to Somalia because Somalia has issued a travel document necessary for his removal.[61] The Court first addresses the preliminary matter of exhaustion before turning to the merits of Petitioner's challenge to his continued detention.[62]

### A. To the Extent that Petitioner Has Not Exhausted Administrative Remedies, Waiver of the Prudential Exhaustion Requirement Is Appropriate.

28 U.S.C. § 2241, the statute under which Petitioner filed his habeas petition, does not contain language requiring a petitioner to exhaust their remedies before seeking habeas relief.[63] As a prudential matter, however, courts require that habeas petitioners exhaust applicable administrative or judicial remedies before seeking relief under § 2241.[64] Even though

---

[56] *Zadvydas*, 533 U.S. at 689.
[57] *Id.* at 701.
[58] *Id.*
[59] *Id.*
[60] *Jennings v. Rodriguez*, 583 U.S. 281, 299 (2018).
[61] Docket 20-1 at 1; Docket 12 at 12.
[62] Because Petitioner challenges only his detention, the Court need not address Federal Respondents' arguments that are based on the premise that he is challenging the removal order issued against him or that he is seeking a judicial stay of his removal. *See* Docket 12 at 6–10.
[63] *Laing v. Ashcroft*, 370 F.3d 994, 997 (9th Cir. 2004) (internal quotation marks and citation omitted).
[64] *Id.*; *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011).

prudential exhaustion "is not a prerequisite to the exercise of jurisdiction,"[65] prudential limits "are ordinarily not optional."[66] Therefore, district courts are generally "not free to address the underlying merits [of a § 2241 petition] without first determining the exhaustion requirement has been satisfied or properly waived."[67] Accordingly, the Court briefly addresses prudential exhaustion.[68]

Petitioner's detention is based on ICE's decision to revoke his release on an order of supervision pursuant to 8 C.F.R. §§ 241.4 and 241.13.[69] These regulations authorize ICE to revoke the release of a noncitizen who was not removed during the statutory removal period, and to return them to custody, in certain circumstances.[70] As relevant here, these circumstances include: (1) when, "on account of changed circumstances, [ICE] determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future";[71] and (2) when, "in the opinion of the [Executive Associate Commissioner for Field Operations or the district director,] . . . [it] is appropriate to enforce a removal order or to commence removal proceedings against a[] [noncitizen][.]"[72] If a noncitizen's release is

---

[65] *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1037 (9th Cir. 2010) (internal quotation marks and citation omitted).

[66] *Castro-Cortez v. I.N.S.*, 239 F.3d 1037, 1047 (9th Cir. 2001), *overruled on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006).

[67] *Laing*, 370 F.3d at 998.

[68] The Court addresses this issue even though Federal Respondents may have forfeited an exhaustion defense by failing to properly raise it. *Cf. Santos-Zacaria v. Garland*, 598 U.S. 411, 423 (2023) (holding that because statutory exhaustion requirement contained in 8 U.S.C. § 1252(d)(1) is not jurisdictional, "it is subject to waiver and forfeiture" (citing *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 192–93 (2019)); *Nutraceutical Corp.*, 586 U.S. at 192 ("Though subject to waiver and forfeiture, some claim-processing rules are 'mandatory'—that is, they are 'unalterable' *if properly raised by an opposing party*." (emphasis added) (internal quotation marks omitted) (quoting *Manrique v. United States*, 581 U.S. 116, 121 (2017))). Federal Respondents took the position that exhaustion of administrative remedies is warranted only after the Court specifically questioned the parties on that issue at the evidentiary hearing. *See* Docket 30 at 25:7–14, 48:19–49:22 (counsel stating, "So what Petitioner is asking the Court to do . . . is substitute its judgment for the administrative process [for reviewing a revocation of release], and I don't think the Court has any authority to do that").

[69] Docket 20-1 at 1. Federal Respondents suggested in their briefing that Petitioner violated his OSUP and that this violation might separately justify Petitioner's detention. Docket 12 at 12–13. Federal Respondents later conceded that the alleged violation of Petitioner's OSUP is not the true cause of his detention. Docket 30 at 52:3–11. Therefore, the Court need not address whether that alleged violation might justify Petitioner's detention. As a result, it is also unnecessary to resolve the various factual disputes associated with this issue.

[70] 8 C.F.R. §§ 241.4(l)(2), 241.13(i)(2).

[71] *Id.* § 241.13(i)(2).

[72] *Id.* § 241.4(l)(2)(iii).

revoked on either of these grounds, they may challenge the revocation decision and their detention through an administrative "revocation custody review" process.[73] This process begins with an "initial informal interview" that ICE is supposed to conduct "promptly" after the noncitizen's return to custody, during which the noncitizen may "respond to the reasons for revocation" provided in a notice issued upon revocation.[74] The noncitizen may further "submit any evidence or information that [they] believe[] shows there is no significant likelihood [they may] be removed in the reasonably foreseeable future[.]"[75] The custody review concludes with a "determination whether the facts as determined warrant revocation and further denial of release."[76]

To the extent that the revocation custody review process is an administrative remedy that Petitioner must exhaust as a prudential matter before contesting his detention in federal court, this requirement should be waived. Even when there may be good reasons to apply the prudential exhaustion requirement,[77] a court may waive the requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void."[78] Here, if Petitioner's detention pending the resolution of his TPS application is unlawful, the entirety of his detention following the revocation of his supervised release will constitute irreparable

---

[73] *Id.* §§ 241.4(l)(3), 241.13(i)(3).

[74] *Id.* § 241.13(i)(3). The Court notes that § 241.4(l)(2) does not explicitly provide for the informal interview required in revocations pursuant to § 241.13(i)(2). The Court assumes that one is nevertheless required when ICE justifies a noncitizen's detention under both regulations, as the agency does here. In addition, the notice of revocation issued to Petitioner contains a promise to afford him an initial interview. Docket 20-1 at 1.

[75] 8 C.F.R. § 241.13(i)(3).

[76] *Id.* §§ 241.4(l)(3), 241.13(i)(3).

[77] *See Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) (indicating that prudential exhaustion is ordinarily appropriate when "(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review" (quoting *Puga v. Chertoff*, 388 F.3d 812, 815 (9th Cir. 2007))); *see also McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) (explaining that "twin purposes" of requiring exhaustion of administrative remedies are "protecting administrative agency authority and promoting judicial efficiency").

[78] *Hernandez*, 872 F.3d at 988 (internal quotation marks omitted) (quoting *Laing*, 370 F.3d 994, 1000 (9th Cir. 2004).

injury.[79] As discussed below, the record before the Court demonstrates that Petitioner's detention is indeed unlawful. For this reason alone, Petitioner should not be forced to wait to seek habeas relief until the conclusion of his revocation custody review. This conclusion is bolstered by the evidence in the record that Petitioner has not been given a meaningful opportunity to pursue this review.[80] Under these circumstances, Petitioner's "interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further."[81]

Thus, to the extent that Petitioner has not satisfied the prudential exhaustion requirement, the Court recommends that the requirement be waived.

**B. Petitioner's Continued Detention Violates Federal Law.**

Petitioner challenges his continued detention as unreasonable under § 1231(a)(6), as interpreted in *Zadvydas*.[82] According to Petitioner, he is unlikely to be removed in the reasonably foreseeable future because: (1) his prima facie eligibility for TPS currently affords him certain statutory benefits that TPS recipients enjoy, including protection from removal while his application is pending; and (2) his prima facie eligibility for TPS makes it very likely that his application will ultimately be granted, which would further extend his statutory protection from removal.[83] Therefore, Petitioner maintains, ICE will be barred from removing him for quite some time, and the temporary travel document has little to no bearing on the likelihood of his removal in the reasonably foreseeable future.[84]

Federal Respondents maintain that Petitioner's continued detention is permissible because they have obtained a travel document authorizing Petitioner's return to Somalia.[85] Federal Respondents agree that Petitioner is prima facie eligible for TPS and that Petitioner

[79] *Arevalo v. Hennessy*, 882 F.3d 763, 766–67 (9th Cir. 2018) (explaining that deprivations of constitutional rights and physical liberty by detention constitute irreparable injury (citing *Hernandez*, 872 F.3d at 994)); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects.").

[80] Docket 1 at 10–11, ¶¶ 36–37; Docket 14-1 at 5, ¶ 13; *see also* Docket 30 at 23:24–24:25.

[81] *McCarthy*, 503 U.S. at 146.

[82] Docket 1 at 6, 11, ¶¶ 22, 39–41; Docket 19 at 3–5.

[83] Docket 19 at 5–6; Docket 30 at 21:3–12.

[84] Docket 30 at 23:3–8.

[85] Docket 12 at 12.

thus cannot lawfully be removed while his application is pending.[86] Federal Respondents suggest that Petitioner's removal is nevertheless reasonably foreseeable due to the travel document, and that § 1231(a)(6) therefore authorizes Petitioner's continued detention.[87]

Because Petitioner's post-removal-order detention under § 1231(a)(6) has exceeded the presumptively reasonable six-month period,[88] the Court first asks whether Petitioner has provided "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."[89] As Petitioner points out, the significance of his pending prima facie TPS application is twofold. First, Petitioner's submission of a prima facie application means that he cannot legally be removed while he awaits a decision on the application.[90] Even if the application is initially denied, Petitioner will be able to appeal, and he will remain unremovable during that process.[91] Second, Petitioner's prima facie eligibility for TPS supports an inference that he is significantly likely to succeed in obtaining TPS.[92] Although the "ultimate decision" whether to grant or deny TPS is within the discretion of USCIS,[93] these decisions are not made arbitrarily. To the contrary, they are made "consistent with the standards for eligibility" for TPS, as set forth in the TPS statute and its implementing regulations.[94]

---

[86] Docket 12 at 9.
[87] Docket 12 at 9.
[88] Docket 12 at 11–12; Docket 19 at 4–5. As of the date of this Report and Recommendation, Petitioner had cumulatively spent about six and a half months in post-removal-period detention. Docket 13 at 2–3, ¶¶ 7–9, 14.
[89] *Zadvydas*, 533 U.S. at 701.
[90] 8 U.S.C. § 1254a(a)(1), (a)(4)(B).
[91] *See* 8 C.F.R. § 244.10(c).
[92] The Court notes that Petitioner certified, under penalty of perjury, that all the information contained in and submitted with his TPS application was complete, true, and correct. Docket 19-3 at 11. Petitioner's counsel further certified, under penalty of perjury, that Petitioner had reviewed the completed application and informed counsel that all the information contained in and submitted with the application was complete, true, and correct. Docket 19-3 at 12. There is no indication that any of the information contained in Petitioner's application is false.
[93] *Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 562 F.3d 1137, 1143 (11th Cir. 2009) (per curiam); *see also* 8 U.S.C. § 1254a(a)(1)(A) ("In the case of an alien who is a national of a foreign state designated under subsection (b) . . . and who meets the requirements of subsection (c), the Attorney General, in accordance with this section[,] . . . *may* grant the alien temporary protected status in the United States . . . ." (emphasis added)).
[94] 8 C.F.R. § 244.2(b); *see also* 8 U.S.C. § 1254a(a)(4)(B) ("In the case of an alien who establishes a prima facie case of eligibility for benefits under paragraph (1), until a final determination with respect to the

These facts provide sufficient "reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."[95] In short, Petitioner's prima facie eligibility for TPS currently poses a complete bar to his removal, and it strongly indicates that his application will eventually be granted.[96] If Petitioner's TPS application is granted, his removal will remain barred as a matter of law until at least March 17, 2026, when the government's TPS designation for Somalia expires,[97] and longer if the designation stays in place. The future of Somalia's TPS designation requires some degree of speculation, as designation decisions—though governed by specific statutory criteria—rest with the government.[98] However, the fact that Somalia's designation has remained in place since the country's initial designation in September 1991 provides some indication of what the future might hold, and there is no evidence in the record that the government is likely to terminate the designation.

As Petitioner has satisfied his initial burden, the Court next considers whether Federal Respondents have offered "evidence sufficient to rebut [Petitioner's] showing."[99] The sole piece of evidence Federal Respondents rely on in this regard is the travel document issued by Somalia.[100] The travel document is temporary,[101] and the only indication that it may be renewed

---

alien's *eligibility* for such benefits under paragraph (1) has been made, the alien shall be provided such benefits." (emphasis added)). A review of recent decisions by the USCIS Administrative Appeals Office further supports the inference that eligibility for TPS corresponds with receiving TPS. Indeed, the Court could find no decisions involving a discretionary denial of TPS despite the applicant's eligibility. *See* U.S. Citizenship & Immig. Servs., AAO Non-Precedent Decisions, https://www.uscis.gov/administrative-appeals/aao-decisions/aao-non-precedent-decisions?uri_1=66&m=All&y=All&items_per_page=10&page=0 (last visited Feb. 25, 2025); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (providing that courts may take judicial notice of filings before other tribunals, as matters of public record, "[t]o determine what issues were actually litigated").

[95] *Zadvydas*, 533 U.S. at 701.

[96] *See Diouf*, 542 F.3d at 1233 (suggesting that petitioners can carry burden to show unlikeliness of removal in reasonably foreseeable future by establishing that their removal "is barred by our own laws"); *cf. also Nadarajah v. Gonzales*, 443 F.3d 1069, 1081–82 (9th Cir. 2006) (concluding that petitioner satisfied burden to show unlikeliness of removal while administrative review was pending because petitioner had won various forms of relief "at every administrative level" and could not legally be removed during pendency of review).

[97] Extension and Redesignation of Somalia for Temporary Protected Status, 89 Fed. Reg. 59135, 59136 (July 22, 2024).

[98] 8 U.S.C. § 1254a(b)(1), (b)(3).

[99] *Zadvydas*, 533 U.S. at 701.

[100] Docket 22-1.

[101] Federal Respondents expressed a general reluctance to show travel documents to individuals to be

or reissued in the future stems from the representations of Federal Respondents' counsel at the evidentiary hearing. Counsel explained that Somalia previously "was not cooperating and would not issue the travel document," but "circumstances have obviously changed" due to the recent change in administration, and Somalia is "now issuing th[ese] travel documents."[102] Counsel further opined that "there is no reason to believe [Petitioner's travel document] wouldn't be renewed or a new travel document issued in the future."[103] However, Federal Respondents presented no evidence to support that belief. Furthermore, a clear basis for Somalia's change in position is not in the record,[104] so the Court cannot make the logical leap that Somalia intends to keep renewing or reissuing Petitioner's travel document. Moreover, although counsel stated that ICE has asked USCIS to expedite a decision on Petitioner's TPS application, it is entirely unclear how long the adjudication of his application might take.[105] Due to these compounding uncertainties, the Court is unable to determine that a valid travel document will likely exist when Petitioner receives a final decision on his TPS application.[106]

Federal Respondents also argue that because USCIS's decision whether to grant Petitioner TPS is "binary," Petitioner's detention has a "definite end" and thus does not

---

removed based on concerns that these individuals might "engage in dilatory conduct" to avoid removal if they were to become aware of a travel document's expiration date. Docket 30 at 39:17–21. Federal Respondents agreed to file Petitioner's travel document *ex parte* for the Court to review *in camera*. The Court has reviewed the travel document and observes only that it expires before any appeal of USCIS's initial TPS determination could reasonably be expected to conclude.

[102] Docket 30 at 39:25–40:5. According to information published by USCIS, as it stands now, 80% of initial applications for TPS by Somali citizens are processed within 15.5 months. U.S. Citizenship & Immig. Servs., Check Case Processing Times, https://egov.uscis.gov/processing-times/ (last visited Feb. 21, 2025); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (endorsing judicial notice of information "made publicly available by government entities" on websites when neither authenticity of websites nor accuracy of information was disputed (citing Fed. R. Evid. 201)); Docket 30 at 34:19–22, 61:19–62:5. This statistic presumably accounts for both expedited and non-expedited applications.

[103] Docket 30 at 40:6–7.

[104] Besides connecting the timing of Somalia's newfound "cooperati[on]" with the new United States administration, Federal Respondents provided no clear rationale for the change. *See* Docket 30 at 39:25–40:2.

[105] Docket 30 at 34:24–35:7.

[106] *Cf. Prieto-Romero v. Clark*, 534 F.3d 1053, 1063 (9th Cir. 2008) (rejecting notion that petitioner was unremovable as a practical matter, noting that "the government introduced evidence showing that repatriations to [petitioner's] country of origin . . . [were] routine and that the government st[ood] ready to remove [petitioner] as soon as judicial review [was] complete").

implicate the constitutional concerns outlined in *Zadvydas*.[107] The Court disagrees. In *Zadvydas*, "the [noncitizens] challenging their detention following final orders of deportation were ones for whom removal was 'no longer practically attainable.'"[108] As a result, the noncitizens' detention under § 1231(a)(6) no longer "served its purported immigration purpose" of effectuating the noncitizens' removal.[109] In other words, there was no longer a "reasonable relation" between the detention and "the purpose for which the individual[s] w[ere] [detained]."[110] The Supreme Court held that detention pursuant to § 1231(a)(6) is limited by these substantive due process principles, and provided the following instructions for habeas courts considering a noncitizen's challenge to their detention under that statute:

> [T]he habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the [noncitizen's] presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute.[111]

Accordingly, even if the issuance of a final determination on Petitioner's TPS application marks a "definite" moment in time when it will be known whether Petitioner can lawfully be removed, that cannot justify his continued detention under § 1231(a)(6) when it appears very likely that he will receive TPS and remain unremovable.[112] Despite being on notice of this issue,[113] Federal Respondents did not offer any evaluation of Petitioner's likelihood of receiving TPS, and did not identify any potential basis on which Petitioner's TPS application could be denied.[114] Detention under these circumstances is simply too

[107] Docket 30 at 46:2–14. Federal Respondents maintain that Petitioner "will be released" if his TPS application is granted. Docket 12 at 13.
[108] *Demore v. Kim*, 538 U.S. 510, 527 (2003) (quoting *Zadvydas*, 533 U.S. at 690); *Zadvydas*, 533 U.S. at 697 ("[8 U.S.C. § 1231(a)(6)] is part of a statute that has as its basic purpose effectuating an alien's removal.").
[109] *Demore*, 538 U.S. at 527 (citing *Zadvydas*, 533 U.S. at 690).
[110] *Zadvydas*, 533 U.S. at 690 (internal quotation marks and alterations omitted) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).
[111] *Id.* at 699–700.
[112] *See id.* at 702 (clarifying that standard does not require noncitizen seeking release "to show the absence of *any* prospect of removal[,] no matter how likely or unforeseeable").
[113] *See* Docket 14 at 2; Docket 19 at 6 ("Respondents have not suggested any grounds on which Mr. Salad might be denied TPS. He has indisputably filed a prima facie TPS application. And Respondents admit that Mr. Salad is presently not deportable.").
[114] Docket 30 at 60:8–11, 60:24–61:5.

disconnected from the statute's purpose of accomplishing the removal of noncitizens subject to a final removal order. Petitioner's detention therefore is unreasonable and exceeds the scope of § 1231(a)(6), as construed by the Supreme Court in *Zadvydas*.

In sum, Petitioner has shown that his removal is not reasonably foreseeable, and Federal Respondents have failed to rebut that showing. Petitioner's pending prima facie TPS application is strong evidence of the unlikelihood of Petitioner's removal in the reasonably foreseeable future. At least for the moment, Somalia's issuance of a travel document authorizing Petitioner's return extinguishes one barrier to his removal. But Petitioner is now undisputedly unremovable by virtue of his pending prima facie TPS application, and all evidence points to the conclusion that his application will be granted and that he will therefore remain protected from removal. Because there is no significant likelihood that ICE will be able to act on any valid travel document from Somalia in the reasonably foreseeable future, the Court concludes that Petitioner's detention is unreasonable and not authorized by § 1231(a)(6).

The Court therefore recommends issuance of a writ ordering Petitioner's immediate release from custody.[115]

## IV. CONCLUSION

The Court finds that the prudential exhaustion requirement should be waived, that Petitioner's continued detention pursuant to 8 U.S.C. § 1231(a)(6) is unreasonable and unauthorized by that statute, and that Petitioner is thus entitled to release from custody. The Court therefore recommends that the Petition at Docket 1 be **GRANTED**. Accordingly, the District Court should issue a writ of habeas corpus requiring Petitioner's immediate release from custody subject to "appropriate conditions" of supervision to be determined by immigration authorities.[116]

Finally, the Court recommends that Petitioner's Objection to Consideration of Burns

[115] *See Jennings*, 583 U.S. at 299 ("[I]f the [noncitizen] 'provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future,' the Government must either rebut that showing or release the [noncitizen]." (quoting *Zadvydas*, 533 U.S. at 701)).
[116] *See* 8 C.F.R. § 241.13(h).

Declaration at Docket 21 be **OVERRULED** as moot.[117]

DATED this 25th day of February, 2025, at Anchorage, Alaska.

s/ Kyle F. Reardon
KYLE F. REARDON
United States Magistrate Judge
District of Alaska

## NOTICE OF RIGHT TO OBJECT

Under 28 U.S.C. § 636(b)(1), a district court may designate a magistrate judge to hear and determine matters pending before the Court. For dispositive matters, a magistrate judge reports findings of fact and provides recommendations to the presiding district court judge.[118] A district court judge may accept, reject, or modify, in whole or in part, the magistrate judge's findings and recommendations.[119]

A party may file written objections to the magistrate judge's findings and recommendations within **6 days**.[120] A response to the objections may be filed within **4 days** after any objection is filed.[121] Objections and responses are limited to five (5) pages in length and should not merely reargue positions previously presented. Rather, objections and responses should specifically identify the findings or recommendations objected to, the basis of the objection, and any legal authority in support. Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the district court's judgment.[122]

---

[117] The disputed declaration is irrelevant to the true cause of Petitioner's detention and played no role in the Court's analysis.
[118] 28 U.S.C. § 636(b)(1)(B).
[119] *Id.* § 636(b)(1)(C).
[120] *Id.*; L.M.J.R. 7(a)(1).
[121] L.M.J.R. 7(a)(2).
[122] *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).