IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ROBEL AHMED SALAD,<br><br>                        Petitioner,<br><br>           v.<br><br>STATE OF ALASKA, Department of Corrections; ARLANDO HERNANDEZ, Superintendent of the Anchorage Correctional Complex, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; THOMAS HOMAN, White House Border Czar, in his official capacity; and CALEB VITELLO, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity;<br><br>                        Respondents. | Case No. 3:25-cv-00029-TMB-KFR<br><br>ORDER ON HABEAS PETITION<br>[DKT. 1] |

## I.    INTRODUCTION

This matter comes before the Court on the Final Report and Recommendation ("Final R&R") of the Magistrate Judge recommending the Court grant Petitioner Roble Ahmed Salad's Petition for Habeas Corpus Relief at Docket 1 (the "Petition").[1] Federal Respondents U.S. Immigration and Customs Enforcement ("ICE"); Thomas Homan, White House Border Czar, in his official capacity; and Caleb Vitello, Acting Director of ICE, in his official capacity (collectively, "Federal Respondents") oppose and move to dismiss the Motion.[2] Federal Respondents filed objections to the Final R&R,[3] and Salad replied.[4]

---

[1] Dkt. 33 (Report and Recommendation Regarding Habeas Petition); Dkt. 1 (Petition for Habeas Corpus Relief).
[2] Dkt. 12 (Federal Respondents' Response in Opposition and Motion to Dismiss).
[3] Dkt. 37 (Federal Respondents' Objection).
[4] Dkt. 38 (Petitioner's Reply).

1

Upon review and consideration of the full record and briefing in this case, the Court finds that Petitioner's continued detention pursuant to 8 U.S.C. § 1231(a)(6) violates federal law. After *de novo* review of the objections, and for the reasons discussed below, the Court **ACCEPTS and ADOPTS** the Final R&R at Docket 33 with modification. Accordingly, the Petition at Docket 1 is **GRANTED**.

## II. BACKGROUND

### A. Immigration Proceedings

This Court adopts and incorporates the Magistrate Judge's statement of facts set forth in the "Background" portion of the Final R&R and as summarized below.[5]

Salad is a citizen of Somalia and entered the country without inspection on December 8, 2022.[6] He applied for asylum after he was apprehended by Border Patrol shortly after crossing into the United States.[7] Salad was then placed into removal proceedings, but he claimed fear of return.[8] A credible fear interview was conducted while he was in Immigration and Customs Enforcement ("ICE") custody and a hearing was conducted.[9] An Immigration Judge found Salad's claim of fear not credible, denied his application for asylum, and ordered him removed to Somalia.[10] Salad reserved appeal of the Immigration Judge's decision, but the Board of Immigration Appeals dismissed Salad's appeal and the removal order became final.[11] ICE began trying to obtain a travel document necessary to remove Salad to Somalia.[12]

---

[5] Dkt. 33 at 2–6.
[6] Dkt. 13 (Declaration of Officer Bradley Hayes) at 1.
[7] *Id.*
[8] *Id.* at 2
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

Nearly one year after his detention began, on November 29, 2023, ICE released Salad after it determined that there was not a significant likelihood of removal in the reasonably foreseeable future because it could not obtain a travel document from Somalia.[13] Under the terms of his release outlined in his order of supervision ("OSUP"), Salad was required to report any change of address to the San Antonio Enforcement and Removal Operations ("ERO") office.[14] A local ERO officer asserted that Salad failed to report back to the San Antonio ERO office on December 18, 2024, as required and Salad became an "immigration fugitive."[15] However, Salad testified that he did report to the ERO office on that day and informed ERO that he was living in Alaska.[16]

On January 15, 2025, Salad filed an Application for Temporary Protected Status ("TPS") with the United States Citizenship and Immigration Services.[17] Then, on February 5, 2025, the Alaska ERO office learned that Salad's case was under review by Somalia to issue a travel document for Salad.[18] A warrant for Salad's arrest was subsequently issued by the Department of Homeland Security (DHS).[19] At that time, Salad was living in Alaska and working as a caregiver for elderly people.[20] Salad provided his Anchorage address on his TPS application.[21]

On February 5, 2025, Salad was arrested by officers from ICE, Anchorage ERO, and agents from ICE's Homeland Security Investigations ("HSI") and FBI Anchorage.[22] Salad was taken into ICE custody and transported to the Anchorage jail.[23] On February 8, 2025, an ERO officer served

---

[13] *Id.*
[14] *Id.* at 3.
[15] *Id.*
[16] Dkt. 30 (Transcript of Proceedings on February 19, 2025) at 8, 15.
[17] Dkt. 13 at 3.
[18] *Id.*
[19] *Id.*
[20] Dkt. 30 at 6.
[21] Dkt. 13 at 3.
[22] *Id.*
[23] *Id.* at 3–4.

Salad with a Notice of Revocation of Release ("Notice") and informed him he was subject to a final order of removal.[24] However, ICE did not have the travel document at that time because Salad's case was under review by Somalia for issuance of the document.[25]

On February 7, 2025, Salad filed the Petition challenging his detention.[26] In the early hours of February 10, 2025, Salad was transported to a detention facility in Texas.[27] Later that morning, the Court ordered the Federal Respondents to file a return showing the true cause of Salad's detention.[28] On February 11, 2025, ICE received a temporary Somali travel document for Salad.[29] A hearing was scheduled on the Petition for February 14, 2025,[30] but ICE failed to transport Salad back to Alaska in time to attend the hearing.[31] Due in part to ICE's failure to timely transport Salad

---

[24] *Id.* at 4; Dkt. 20-1 (Notice of Revocation of Release).
[25] Dkt. 13 at 4; Dkt. 20-1.
[26] Dkt. 1.
[27] Dkt. 13 at 4. Salad's counsel informed the Court that she attempted to visit him at the Anchorage jail on Friday, February 7, 2025, but was told that he was in medical segregation. Dkt. 14-1 (Declaration of Margaret Stock) at 3. Jail staff also informed her that the phone call scheduling service was unavailable until the following Monday, February 10, so she could not speak with him by phone. *Id.* at 3–4. Finally, jail staff informed her that Salad could not receive documents while he was in medical segregation. *Id.* at 4. Salad's counsel called the next morning (Saturday) and was informed Salad was still in medical segregation. *Id.* Despite Salad's medical segregation and complete unavailability to his counsel, an ERO officer was able to serve Salad with the Notice and determine on Sunday it was safe to transport him to Texas. *Id.* at 4–5. This was done without informing either his counsel or the Court even though the present proceeding had yet to be concluded. *Id.* at 5. Salad's counsel was not informed that Salad had been transported to Texas until she called the Anchorage jail *on Monday morning*. *Id.* at 4. Salad's counsel has expressed concern that she was denied access to her client while an ERO officer served and removed Salad to Texas. *Id.* at 5. Salad's counsel has asserted these facts to the Court under penalty of perjury and no contradicting information has been provided. *Id.* at 8. While the Court cannot determine on this record whether Salad was intentionally or inadvertently moved without informing either his counsel or the Court, the Court counsels against any future unilateral action in the middle of court proceedings.
[28] Dkt. 4 (Order to Show Cause).
[29] Dkt. 13 at 4.
[30] Dkt. 17 (Minute Entry).
[31] Dkt. 13 at 4.

back to Alaska, the hearing was then converted to a status conference.[32] At the status conference, the Court heard the parties' arguments as to the merits of the Petition and asked the Federal Respondents to provide copies of Petitioner's Notice, the administrative warrant that led to Petitioner's arrest, and Petitioner's OSUP.[33]

### B. Procedural History

At an evidentiary hearing on February 19, 2025, the Court heard testimony from Salad and Salad's roommate.[34] The Court also admitted four exhibits offered by Salad.[35] The Federal Respondents did not submit any new evidence at the hearing.[36]

Upon review of the parties' submissions and the full record, the Magistrate Judge found that Salad's continued detention violates federal law and recommended the Court grant the Petition.[37] Pursuant to *United States v. Zadvydas*, the Magistrate Judge determined that Salad has shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future" because the fact that Salad is *prima facie* eligible for TPS status means he is currently not removable.[38] Further, even if his TPS application is denied, he will remain unremovable until the completion of the appeal process.[39] The Magistrate Judge then determined that the Federal Respondents failed to rebut Salad's showing because (1) the travel document on which they rely is temporary and (2) they presented no evidence tending to show the travel document would be renewed in the future.[40] The Magistrate Judge also found the Federal

---

[32] Dkt. 17.
[33] Dkt. 35 (Transcript of Proceedings on February 14, 2025) at 16, 25.
[34] Dkt. 30 at 5, 16, 28–29.
[35] *Id.* at 7, 9, 13.
[36] *Id.* at 4.
[37] *See generally* Dkt. 33.
[38] Dkt. 33 at 11.
[39] *Id.*
[40] *Id.* at 12–13.

Respondents' argument that removal was foreseeable because Salad's TPS application would end with one of two outcomes—denial of the TPS application followed by Salad's removal, or a grant of his application followed by his release—unpersuasive.[41] Therefore, the Magistrate Judge recommends issuance of a writ ordering Salad's immediate release from custody.[42]

The Federal Respondents object to the Magistrate Judge's Final R&R on two grounds: (1) that the Magistrate Judge incorrectly interpreted the standard in *Zadvydas*, and (2) that the Magistrate Judge failed to give weight to the impact of the temporary travel document on removability.[43] The Federal Respondents argue that: "*Zadvydas* does not state that just because something in the future *may* interfere with INS's plans, there is no [significant likelihood of removal in the reasonably foreseeable future]."[44] They assert that a decision on his TPS application would be a "definite end" to his detention.[45] They also argue that "continued detention is reasonably necessary to secure removal with a cooperating country."[46]

Salad responds that there is no significant likelihood that he will be removed in the reasonably foreseeable future because it is "virtually certain that he will not be removable through the end of the most recent TPS designation."[47] He further argues that the Federal Respondents still fail to rebut his showing.[48] Salad maintains that whether he will become deportable again is speculative because (1) the travel document will expire before the TPS determination will become

---

[41] *Id.* at 14.
[42] *Id.* at 15.
[43] Dkt. 37 (Federal Respondents' Objection) at 2–3.
[44] *Id.* at 2.
[45] *Id.* at 3.
[46] *Id.*
[47] Dkt. 38 (Petitioner's Response) at 1.
[48] *Id.* at 5.

6

Case 3:25-cv-00029-TMB-KFR   Document 39   Filed 03/07/25   Page 6 of 14

final and (2) the Federal Respondents provided no evidence that the travel document will be renewed.[49]

### III. LEGAL STANDARD

*A. The District Court's Review of the Magistrate Judge's Report and Recommendation*

The matter is now before this Court pursuant to 28 U.S.C. § 636(b)(1), which provides that a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" and shall review objections *de novo*.[50]

*B. Detention of a Noncitizen During Immigration Proceedings*

The Immigration and Nationality Act ("INA") permits detention of noncitizens present in the United States during immigration proceedings.[51] Pursuant to 8 U.S.C. § 1231, a noncitizen who is ordered removed shall be removed by DHS within 90 days.[52] During the removal period, the noncitizen must be detained.[53] If the Government fails to remove the noncitizen during those 90 days, the statute only authorizes further detention if the noncitizen is: (1) "inadmissible" under certain grounds, (2) "removable" as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy, (3) or has been "determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal."[54]

In *Zadvydas v. Davis*, the Supreme Court addressed whether there was a limit to the time a noncitizen can be detained after the initial 90-day removal period expires.[55] The Court held that

---

[49] *Id.* at 5.
[50] 28 U.S.C. § 636(b)(1).
[51] 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), 1231(a).
[52] 8 U.S.C. § 1231(a)(1)(A).
[53] 8 U.S.C. § 1231(a)(2).
[54] 8 U.S.C. § 1231(a)(6); *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001).
[55] 533 U.S. at 682.

the statute limits a noncitizen's "post-removal-period detention to a period reasonably necessary to bring about [their] removal from the United States."[56] The statute "does not permit indefinite detention."[57] A noncitizen may only be held in confinement until "it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."[58] A six month period of detention is presumptively reasonable.[59]

When detention exceeds this presumptively reasonable period, the noncitizen has the initial burden to "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."[60] If the noncitizen satisfies the initial burden, then the Government "must respond with evidence sufficient to rebut that showing."[61] If the Government fails to meet its burden, then the non-citizen must be released from detention.[62]

C. Eligibility for Temporary Protected Status

The TPS program "provides humanitarian relief to foreign nationals in the United States who come from specified countries."[63] Under 8 U.S.C. § 1254a, "[t]he Government may designate a country for the program when it is beset by especially bad or dangerous conditions, such as arise from natural disasters or armed conflicts."[64] Unlawful entry into the United States does not preclude a noncitizen from being granted TPS.[65] TPS status protects a noncitizen "from removal and authorizes them to work here for as long as the TPS designation lasts."[66] If a noncitizen

---

[56] *Id.* at 689.
[57] *Id.*
[58] *Zadvydas*, 533 U.S. at 701.
[59] *Id.* at 701.
[60] *Id.*
[61] *Id.*
[62] *Jennings v. Rodriguez*, 583 U.S. 281, 299 (2018).
[63] *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021).
[64] *Id.*
[65] *Id.*
[66] *Id.*

"establishes a *prima facie* case of eligibility" for TPS status, then the noncitizen shall be provided the benefit of TPS status until a final determination is made with respect to the noncitizen's eligibility.[67]

Somalia was first designated for TPS on September 16, 1991, and its designation has been "consecutively extended" since that time.[68] Somalia's current designation will expire on March 17, 2026, unless it is extended.[69]

### D. The District Court's Review of Habeas Petitions

A noncitizen who is being detained may bring a writ of habeas corpus pursuant to 28 U.S.C. § 2241 if that person believes their detention violates the Constitution or other federal law.[70] Administrative exhaustion is prudential rather than a jurisdictional requirement for habeas review under § 2241.[71]

## IV. ANALYSIS

### A. To the Extent Salad Has Not Exhausted Administrative Remedies, the Court Waives the Exhaustion Requirement

On habeas review under § 2241, exhaustion is a prudential rather than jurisdictional requirement.[72] Courts may require prudential exhaustion if "(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3)

---

[67] 18 U.S.C. § 1254a(a)(4)(B).
[68] Extension and Redesignation of Somalia for Temporary Protected Status, 89 Fed. Reg. 59135, 59136 (July 22, 2024).
[69] *Id.*
[70] 28 U.S.C. § 2241(c)(3); *see also Zadvydas*, 533 U.S. at 688 ("We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention.").
[71] *Acevedo-Carranza v. Ashcroft*, 371 F.3d 539, 541 (9th Cir. 2004).
[72] *Id.*

administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review."[73] Even if these factors weigh in favor of prudential exhaustion, the court may waive the exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void."[74]

First, the Court determines that an administrative appellate record is not necessary to resolve the legal question of whether there is a significant likelihood of removal in the reasonably foreseeable future. Second, the Court does not believe that waiver of prudential exhaustion would encourage the deliberate bypass of the administrative scheme because this issue appears to arise rarely and, once the question is addressed, it may cease to arise. Third, administrative review would not preclude the need for judicial review, because litigants would undoubtedly seek this Court's determination of whether the standard applied by the agency was correct. Even if these factors weighed against prudential exhaustion, the Court finds that the continued unlawful detention of Salad would cause irreparable injury. Therefore, even if Salad has not exhausted administrative remedies, the Court determines that waiver of prudential exhaustion is appropriate.

> B. *Continued Detention of Salad is Unlawful Because There is No Significant Likelihood of Removal in the Reasonably Foreseeable Future*

The Court accepts and adopts the Magistrate Judge's determination that Salad has provided good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future and that the Federal Respondents have failed to rebut this showing.[75]

---

[73] *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007).
[74] *Hernandez v. Sessions*, 872 F.3d 976, 897 (9th Cir. 2017) (quoting *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004)).
[75] Dkt. 33 at 10–15.

10

Case 3:25-cv-00029-TMB-KFR     Document 39     Filed 03/07/25     Page 10 of 14

### 1. Salad's Continued Detention is Unlawful Under *Zadvydas*

The Federal Respondents challenge the Magistrate Judge's interpretation of *Zadvydas* and argue that Salad's continued detention is permissible under its holding.[76] They assert that *Zadvydas* should not be applied to mean "that just because something in the future *may* interfere with INS's plans, there is no [significant likelihood of removal in the reasonably foreseeable future]."[77] However, that is not how the Magistrate Judge, or this Court, interprets *Zadvydas*. Rather, the "INS's plans," as the Federal Respondents describe Salad's deportation, depend on the occurrence of multiple unguaranteed future events—principally, the denial of Salad's TPS application and the issuance of a new travel document—and the Federal Respondents have failed to submit sufficient evidence that any of these events are significantly likely to happen.

The parties do not contest that Salad's detention has exceeded the reasonably foreseeable six-month period established in *Zadvydas*.[78] Salad has shown that he has applied for TPS and is *prima facie* eligible.[79] The parties also do not contest that Salad cannot be removed while his application is pending.[80] This position is reflected in statute: the INA prohibits removal of an individual who is *prima facie* eligible for TPS.[81] Although the ultimate decision whether to approve or deny his application rests with the United States Customs and Immigration Services (USCIS), Salad's *prima facie* eligibility supports an inference that he is highly likely to obtain TPS

---

[76] Dkt. 37 at 2–3.
[77] *Id.* at 2.
[78] Dkt. 12 at 11–12; Dkt. 30 at 21
[79] Dkt. 35 at 7–8, 21–22; Dkt. 19-3 (TPS Application).
[80] Dkt. 35 at 19.
[81] 8 U.S.C. § 1254a(a)(1)(A) (prohibiting removal of individuals granted TPS); 8 U.S.C. § 1254a(a)(4)(B) ("In the case of an alien who establishes a *prima facie* case of eligibility for benefits under paragraph (1), until a final determination with respect to the alien's eligibility for such benefits under paragraph (1) has been made, the alien shall be provided such benefits.").

because USCIS makes the decision to grant TPS "consistent with the standards of eligibility."[82] Further, the Court agrees with the Magistrate Judge's assessment that Somalia's continued TPS designation since 1991 provides some indication that the government may continue to renew the designation.[83] If Salad is granted TPS, he would not be removable unless Somalia's designation expires.[84]

Even if Salad's TPS application is denied, Salad would have a right to appeal the decision, during which time he would remain unremovable.[85] This further attenuates the likelihood of his removal in the reasonably foreseeable future. Salad has shown there is great likelihood that he will be granted TPS and will remain unremovable for the foreseeable future, and even if his application is denied, he has shown the likelihood of his removal in the reasonably foreseeable future is by no means significant. Salad has met his burden under *Zadvydas*.

Having failed to rebut this showing, the Federal Respondents argue that the constitutional concerns raised in *Zadvydas* are not present here because Salad's case will end one of two ways: "he will be removed or he will be granted TPS to stay."[86] The Court is not persuaded by the Federal Respondent's argument that, because Salad's case will end one of two ways, "there is a definite end to [Salad's] detention in the reasonably foreseeable future."[87] This argument presents a gloss on the operative language in *Zadvydas*: "if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute."[88] Because Salad could be granted TPS—and even if he is not granted TPS, his application likely will not be resolved

---

[82] 8 C.F.R. § 244.10(b).
[83] Dkt. 33 at 12.
[84] 8 U.S.C. § 1254a; *Sanchez*, 593 U.S. at 412.
[85] 8 C.F.R. §§ 244.10(c); 244.10(e)(2).
[86] Dkt. 30 at 44; *see also* Dkt. 37 at 2–3.
[87] Dkt. 37 at 3.
[88] 533 U.S. at 699–700.

12

for some time—the Federal Respondents have not shown a *significant likelihood* of Salad's removal in the *reasonably foreseeable* future. Based on the evidence before the Court, Salad has provided good reason to believe that, because he is *prima facie* eligible for TPS, there is no significant likelihood of removal in the reasonably foreseeable future which the Federal Respondents have failed to rebut.

    2. <u>The Temporary Travel Document Does Not Show a Significant Likelihood of Salad's Removal in the Reasonably Foreseeable Future</u>

The Federal Respondents objected "to the notion that the current travel documents do not have any bearing on [Salad's] removability."[89] They point to a temporary travel document issued by Somalia and assert that even after the expiration of that travel document "there is no reason to believe . . . a new travel document [would not be] issued in the future."[90] The Magistrate Judge gave proper weight to the existence of the travel document. The fact that the Federal Respondents presented a travel document does not convince the Court that there is a significant likelihood of removal in the reasonably foreseeable future. The Court reviewed the temporary travel document, as did the Magistrate Judge, and observes that it expires before any appeal of USCIS's initial TPS determination could reasonably be expected to conclude. Similarly, the Court is not persuaded by the Federal Respondents' argument that the present travel document indicates a likelihood that they will be able to obtain another travel document in the future.[91] The Federal Respondents presented no evidence to support this position[92] and their argument is simply too attenuated. They rely on the occurrence of multiple unguaranteed future events, the denial of Salad's TPS application and the issuance of a new travel document. The Court is not convinced that these

---

[89] Dkt. 37 at 3.
[90] Dkt. 30 at 40; *see also* Dkt. 22-1 (travel document).
[91] *Id.* at 2.
[92] *See generally* Dkt. 30 (absence); Dkt. 37 (absence).

13

potential future events create a significant likelihood of removal in the reasonably foreseeable future.

## V. CONCLUSION

Accordingly, the Court **ACCEPTS and ADOPTS** the Final R&R at Docket 33 with the following modification at page 15:

1. Strike: "appropriate conditions of supervision to be determined by immigration authorities."

2. Add: "the conditions of release dictated in his November 28, 2023, OSUP.[93] If immigration authorities deem these conditions insufficient, they shall modify the conditions through appropriate administrative process after Salad's release from detention.[94]"

THEREFORE, the Court **GRANTS** the Petition at Docket 1 and finding the Petitioner is entitled to immediate release from custody, a Writ shall issue. Salad shall file **on or before 12:30 PM, on March 7, 2025**, a proposed writ of habeas corpus in word format with the Court at burgessproposedorders@akd.uscourts.gov.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 7th day of March, 2025.

/s/ _Timothy M. Burgess_____
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[93] Dkt. 19-1 (OSUP).
[94] 8 C.F.R. § 241.13(h)(1).